**Larry Joe CARNINE, Sr.,**
**Petitioner–Appellant,**

v.

**UNITED STATES of America,**
**Respondent–Appellee.**

**No. 91–1978.**

United States Court of Appeals,
Seventh Circuit.

Submitted July 24, 1992.*

Decided Sept. 10, 1992.

---

* After preliminary examination of the briefs, the court notified the parties that it had tentatively concluded that oral argument would not be helpful to the court in this case. The notice provided that any party might file a "Statement as to Need of Oral Argument." See Fed. R.App.P. 34(a); Circuit Rule 34(f). No such statement having been filed, the appeal has been submitted on the briefs and record.

**926**

Larry J. Carnine, Sr., pro se.

Linda S. Chapman, Asst. U.S. Atty., Steven D. Debrota, Indianapolis, Ind., for respondent-appellee.

Before CUMMINGS, POSNER, and MANION, Circuit Judges.

CUMMINGS, Circuit Judge.

The government and Larry Carnine, Sr. entered into a guilty plea agreement that appears to be missing a part: the start date of his sentence. Contending that his plea is constitutionally defective, Carnine brought an action to vacate, set aside, or correct the sentence pursuant to 28 U.S.C. § 2255. The district court denied the motion, dismissing it for lack of jurisdiction as to any claim concerning the computation of Carnine's term and finding the substance of his challenge to be without merit. Were Carnine's claim in fact a call for recalculating his sentence, the district court would have been correct in concluding that it lacked jurisdiction to hear the motion. But since his motion in essence concerns the validity of the plea agreement itself, the district court had jurisdiction to entertain the claim. Because we find Carnine's assertions sufficient to require an evidentiary hearing, we reverse the district court's order and remand for further proceedings.

## I. BACKGROUND

At the time that he entered into the plea agreement, Carnine was incarcerated at the Federal Correctional Institute in Ashland, Kentucky, where he was serving a forty-six-month sentence on four federal counts involving auto theft. That sentence (hereinafter, "the Ohio sentence") ran from the day of his arrest on October 18, 1988.

While serving the Ohio sentence, Carnine was indicted in Indiana on twenty-two counts charging him with violating federal laws also related to stolen motor vehicles.[1] At a hearing on the day scheduled for Carnine's trial, the court determined that he was mentally competent to stand trial, the government presented various plea options it had offered Carnine, and the parties conferred about the terms of a possible agreement, both on the record and off. Assistant United States Attorneys Linda S. Chapman and R. Stanley Powell appeared on behalf of the government. Carnine, who was represented by S. Frank Mattox and Robert W. Hammerle, entered his guilty plea to seventeen of the counts. The court read aloud the final agreement between Carnine and the government, which states in relevant part:

> It is understood that should the Court accept this plea agreement that the sentence to be imposed is a term of imprisonment of sixty (60) months *to be served concurrently with the defendant's previously imposed sentence* in the Southern District of Ohio *on October 18, 1988,* pursuant to Rule 11(e)(1)(C).

Plea Agreement, filed Oct. 23, 1989, at ¶ 2 (emphasis added).

---

1. Eleven counts charged him with violating 18 U.S.C. § 2313 (sale or receipt of stolen vehicles); nine counts implicated 18 U.S.C. § 2312 (transportation of stolen vehicles); one count involved 18 U.S.C. § 511 (altering or removing motor vehicle identification numbers); and one count charged Carnine with violating 18 U.S.C. § 371 (conspiracy). Each of these counts carried a possible maximum term of five years, or a total of 110 years. Eight other people were indicted as well. Through his lawyer, Carnine initially moved to dismiss these charges, claiming that the indictment violated several constitutional rights, including the prohibition against double jeopardy. Eventually the eight other defendants also pleaded guilty.

On December 8, 1989—fourteen months into the forty-six-month Ohio sentence—the district court sentenced Carnine to a sixty-month term of imprisonment (hereinafter, "the Indiana sentence").[2] At the sentencing hearing, the judge stated that

> the defendant is hereby committed to the custody of the attorney general or his authorized representative for imprisonment for a term of sixty months on each count, to be served concurrently with each other, *and with the term of imprisonment that the defendant is currently serving* in cause number CR–87–096–01, imposed in the U.S. District Court, Cincinnati, Ohio.

Transcript of Sentencing Hearing, Dec. 8, 1989, at 12; Appellee's Appendix (hereinafter "App.") at 72 (emphasis added). Carnine did not file a direct appeal.

After learning in August of 1990 that the Bureau of Prisons (BOP) was calculating the Indiana sentence with a start date of December 8, 1989, he filed a § 2255 motion contending that the government is refusing to abide by the terms of the agreement. Alternatively, he claimed on one ground that if the government is correct in its interpretation, then the agreement is invalid because the U.S. Attorney induced him to plead guilty by promising that the Indiana sentence would run from the commencement date of the Ohio sentence. On another ground, he claimed ineffective assistance of counsel because his attorney allowed him to sign the agreement under the erroneous belief that the Indiana sentence would commence retroactively.

On appeal, Carnine makes three arguments: that the court had jurisdiction to hear his claim; that the court did not fully consider the matter and should not have dismissed his § 2255 motion without an evidentiary hearing; and that it abused its discretion by issuing a "blanket denial" foreclosing any future relief on related issues. The crux of the dispute is whether the Indiana sentence began to run on December 8, 1989, as the government contends, or on October 18, 1988 (the same date the Ohio sentence commenced), as Carnine argues.

## II.  ANALYSIS

### A.  Jurisdiction

■ Section 2255 is the proper vehicle for collaterally attacking the validity of a conviction and sentence. Judicial review pursuant to 28 U.S.C. § 2241, in contrast, provides the appropriate mechanism in a claim concerning the computation of a sentence. *Atehortua v. Kindt,* 951 F.2d 126, 129 (7th Cir.1991); *United States v. Miller,* 871 F.2d 488, 490 (4th Cir.1989); *United States v. Ford,* 627 F.2d 807, 813 (7th Cir. 1980), certiorari denied, 449 U.S. 923, 101 S.Ct. 324, 66 L.Ed.2d 151. Such review is obtainable, however, only after a prisoner exhausts administrative remedies. *United States v. Brumbaugh,* 909 F.2d 289 (7th Cir.1990).

■ Carnine undoubtedly seeks a particular execution of the Indiana sentence that supports his understanding of the plea agreement. But the thrust of his complaint concerns the constitutionality of the agreement. The district court incorrectly characterized Carnine's claim as one that "solely concerns the question of the computation of his sentence." App. at 2. In fact, "the appropriate remedy is under § 2255, not 28 U.S.C. § 2241, since the alleged errors occurred at or prior to sentencing." *United States v. Flores,* 616 F.2d 840, 842 (5th Cir.1980). Therefore, the district court erred in dismissing Carnine's motion for lack of jurisdiction.

■ Although § 2255 furnishes an appropriate basis of relief in the instant case, "a district court cannot reach the merits of an appealable issue in a § 2255 proceeding unless that issue has been raised in a procedurally appropriate manner." *Theodorou v. United States,* 887 F.2d 1336, 1339 (7th Cir.1989). The failure to raise constitutional challenges to a conviction on direct appeal bars a petitioner from raising the

---

**2.** The district court sentenced Carnine prior to the date the United States Sentencing Guidelines took effect.

same issues in a § 2255 proceeding without showing both (1) good cause for the failure to pursue a direct appeal and (2) actual prejudice resulting from the alleged constitutional violation. *Id.* at 1440.

■ In maintaining that Carnine waived his arguments when he failed to raise them on direct appeal, the government is grasping at straws. Carnine had good cause because he did not become aware of the effective commencement date of the Indiana sentence until he obtained a report from the BOP, well after the deadline for direct appeal had elapsed. Actual prejudice possibly resulted either from the government's alleged refusal to abide by the terms it agreed to, from alleged promises made by the prosecutor in order to induce Carnine to plead guilty, or from his receiving ineffective assistance of counsel.[3] *E.g., Meagher v. Dugger,* 861 F.2d 1242, 1247 (11th Cir.1988).

## B. The Plea Agreement

■ We review evidence and draw all reasonable inferences from it in a light most favorable to the government when an appellant seeks post-conviction relief under § 2255. *Messinger v. United States,* 872 F.2d 217, 219 (7th Cir.1989); *United States v. Cosentino,* 869 F.2d 301, 302 (7th Cir. 1989), certiorari denied, 492 U.S. 908, 109 S.Ct. 3220, 106 L.Ed.2d 570. We disagree with the district court's view that Carnine neither alleges any invalidity in his sentence nor expresses discontent with the plea agreement itself. Carnine advances precisely these claims.

■ This circuit regards plea agreements as contracts conferring all of the attendant rights and obligations governed by ordinary principles of contract law. See *United States v. Osborne,* 931 F.2d 1139, 1162 (7th Cir.1991); *United States v. So-*

*phie,* 900 F.2d 1064, 1071 (7th Cir.1990), certiorari denied, —— U.S. ——, 111 S.Ct. 124, 112 L.Ed.2d 92. Plea agreements, though, are unique contracts "in which special due process concerns for fairness and the adequacy of procedural safeguards obtain." *United States v. Ataya,* 864 F.2d 1324, 1329 (7th Cir.1988) (citations omitted). When presented with questions concerning the interpretation and enforcement of ambiguous plea agreements, "this court has developed a consistent set of principles ...", *United States v. Fields,* 766 F.2d 1161, 1167 (7th Cir.1985), one of which holds that "the essence of the particular agreement and the Government's conduct relating to its obligations in that case" are determinative. *United States v. Mooney,* 654 F.2d 482, 486 (7th Cir.1981). With these principles in mind, we turn to the language of the contract and various discussions about it.

### 1. The written agreement

■ Our cases firmly establish an expectation that the government draft plea agreements with particular care and precision to avoid exactly the type of definitional pitfalls we encounter here. *Fields,* 766 F.2d at 1169 ("The danger that a criminal defendant will be misled into relinquishing important constitutional rights based on an inaccurate understanding of the plea agreement increases in direct proportion to the agreement's vagueness."); *United States v. DeMichael,* 692 F.2d 1059, 1062–63 (7th Cir.1982) ("It is most distasteful to be confronted with conflicting testimony by lawyers with respect to the terms of an agreement which ought to be clear and indisputable in its terms."), certiorari denied, 461 U.S. 907, 103 S.Ct. 1878, 76 L.Ed.2d 809; *United States v. Bowler,* 585 F.2d 851 (7th Cir.1978); see also *United States v. Crusco,* 536 F.2d 21, 26 (3d Cir.1976) ("[The

---

**3.** In any case, he did not in fact receive the rights which he believed he had secured. Discounting the possibility of credits for good behavior in prison, the five-year Indiana sentence will end in October 1993 at the latest, according to Carnine's reasoning. By the government's accounting, it should be complete by December 1994—more than a year later, and not at all what Carnine says he expected.

The government emphasizes that Carnine argues not that he never would have pled guilty at all, but "only" that he would not have entered into this particular agreement had he known the intentions of the U.S. Attorney. This distinction is of little consequence. The actual plea agreement—whether ambiguous on its face or induced under false pretenses—is the focal point of this appeal.

government] may reach port in the plea bargaining process but founder there because of careless or loose language in its commitment.").

The plea agreement says nothing about the start date of the Indiana sentence, imposing on Carnine "a term of imprisonment of sixty (60) months to be served concurrently with the defendant's previously imposed sentence in the Southern District of Ohio on October 18, 1988...." Plea Agreement at ¶ 2.

Since the definition of "concurrently" is hardly talismanic, usage of the word in the above context is not particularly illuminating. Concurrent sentences are "[t]wo or more terms of imprisonment, all or part of each term of which is served simultaneously...." BLACK'S LAW DICTIONARY 264 (5th ed. 1979). *Cf. State* ex. rel. *Lillemoe v. Tahash,* 280 Minn. 176, 159 N.W.2d 99, 102 (1968). Clearly, then, both Carnine's and the government's understanding of "concurrently" fit this meaning. Absent from the definition of concurrent is precisely the key information missing from the plea agreement: When does a sentence designated as concurrent with another term begin to run? *Cf. Perkins v. Peyton,* 369

F.2d 590, 593 (4th Cir.1966) (distinguishing between complete concurrency and partially consecutive sentences). The government underscores the fact that neither the agreement nor the court expressly provided for a retroactive sentence. Appellee's Brief, filed Aug. 27, 1991, at 22–23. But we emphasize that "[a] plea agreement is not an appropriate context for the Government to resort to a rigidly literal approach in the construction of language." *Fields,* 766 F.2d at 1167.[4]

Specific reference in the plea agreement to the day October 18, 1988 on the one hand may justify the significance Carnine attaches to its inclusion, namely his contention that it indicates the effective start date of the Indiana sentence. On the other hand, the date is quite possibly nothing more than a modifier identifying the sentence previously imposed by the court in the Southern District of Ohio, as the government implies. But if the date is indeed merely descriptive of the Ohio sentence, then it is also superfluous; "in the Southern District of Ohio" makes it abundantly clear which sentence is the one "previously imposed", the date aside. In short, the language of the agreement and the

---

**4.** A sentence can begin to run before it is imposed. See, *e.g., Jones v. Thomas,* 491 U.S. 376, 384, 109 S.Ct. 2522, 2527, 105 L.Ed.2d 322 ("crediting time served under one sentence against the term of another has long been an accepted practice"); *United States* ex rel. *Del Genio v. United States Bureau of Prisons,* 644 F.2d 585, 589 (7th Cir.1980), certiorari denied, 449 U.S. 1084, 101 S.Ct. 870, 66 L.Ed.2d 808 (observing in dicta that a second sentence, ordered to run concurrently with an earlier one, may be treated as having commenced before the date it was imposed). *Cf. United States v. Long,* 823 F.2d 1209, 1212 (7th Cir.1987) (acknowledging wide discretion of district judges in fashioning sentences). But see *Shelvy v. Whitfield,* 718 F.2d 441 (D.C.Cir.1983) (second sentence ordered to run concurrently with an existing sentence runs with the remainder of the earlier imposed sentence); *United States v. Flores,* 616 F.2d 840 (5th Cir.1980) (defendant's erroneous construction of the meaning of a concurrent sentence insufficient to invalidate plea bargain or to trigger hearing); *Wilson v. Henderson,* 468 F.2d 582 (5th Cir.1972) (sentence cannot commence prior to day of pronouncement even if it is to be served concurrently with another sentence already being served).

In a recent case whose facts closely resemble this one, appellant Louis Ferrara claimed he was not sentenced in accordance with his reasonable understanding of a plea agreement. *United States v. Ferrara,* 954 F.2d 103 (2d Cir. 1992). In exchange for his guilty plea, the government agreed to " 'recommend, at the time of sentencing, that a sentence of imprisonment be imposed concurrent to that federal sentence of imprisonment which [Ferrara] is currently serving.'" *Id.* at 104. At sentencing, Ferrara's lawyer asked the district court judge whether the sentence would begin retroactively, commencing on the day eighteen months earlier when the first sentence started to run. " 'No,' " responded the judge, " 'it runs concurrent from today.'" *Id.*

Based on the record, the court found that Ferrara reasonably could have understood and expected concurrent sentences to end, or at least to begin, on the same date. *Id.* at 105. Stating that "a plea agreement must follow the reasonable understandings and expectations of the defendant with respect to the bargained-for sentence", the court vacated Ferrara's conviction and remanded with instructions that he be allowed to withdraw his plea. *Id.* The meaning of the word "concurrent", as Ferrara claimed, was ambiguous.

words of the judge leave one guessing about the start date of the Indiana sentence.[5]

### 2. Discussions pertaining to the agreement

■ Determining the existence and meaning of a plea agreement necessitates scrutiny of the parties' reasonable expectations, an objective standard.[6] *United States v. Strawser*, 739 F.2d 1226, 1230 (7th Cir.1984), certiorari denied, 469 U.S. 1038, 105 S.Ct. 518, 83 L.Ed.2d 407; *Mooney*, 654 F.2d at 486. That requirement becomes especially compelling when the terms of an agreement are indefinite.

Carnine says he reasonably expected that he had contracted for the Indiana sentence to begin on the same date as the Ohio sentence. This claim finds support in a colloquy at the first hearing on October 23, 1989, when Assistant United States Attorney Powell, Carnine, and Mattox, his attorney, discussed with the court two different approaches under consideration in their bargaining, which occurred both on and off the record. After the judge inquired whether he understood the terms of the agreement as described by Powell, Carnine expressed his position:

> DEFENDANT CARNINE: Yes. Just one small item. The time period, it's supposed to be identical, no more time. Supposed to be run concurrent with the time I am doing, and not another day.
> MR. POWELL: Your Honor, I can't bind the court to that, that—
> THE COURT: That is a recommendation.
> DEFENDANT CARNINE: Yes, ma'am.

THE COURT: But I told you that I am not a party to your contract. You make a recommendation to the court.

> DEFENDANT CARNINE: Yes, ma'am.
> THE COURT: Unless you wish to enter into an 11(e)(1)(C).
> MR. POWELL: No, ma'am. This is an 11(e)(1)(B). It would be all seventeen counts, concurrent time, concurrent with one another. And sentencing would be in the discretion of the court.
> MR. MATTOX: That was not my understanding of the agreement. My understanding would be, he would not spend another day, that it was 11(e)(1)(C).
> MR. POWELL: We were talking earlier about pleading guilty to one count under 11(e)(1)(C). He wanted to plead guilty to all seventeen counts, to have all his charges resolved—
> MR. MATTOX: That's not my understanding. My understanding would be that—

App. at 24–15.

At that point the court interrupted to explain to Carnine the two different options available under Rules 11(e)(1)(B) and (C) of the Federal Rules of Criminal Procedure. Although the attorneys disagreed about the scope of the agreement at this stage of the negotiations, Mattox evidently shared Carnine's understanding that the two sentences would run identically concurrent to one another. Powell's statement to the effect that he could not bind the court to that interpretation comports with the requirements of Rule 11(e)(1)(B).[7] Eventually, however, Carnine pled guilty to all sev-

5. Nor does 18 U.S.C. § 3568 (in effect prior to the enactment of § 3585) clarify matters. Although neither party mentions it, that provision states in pertinent part: "The sentence of imprisonment of any person convicted of an offense shall commence to run from the date on which such person is received at the penitentiary, reformatory, or jail for service of such sentence." To the extent that they designate when a sentence commences, statutes and case law interpreting them are besides the point. At issue here is what the prosecutor promised Carnine and what rights he reasonably believed he had contracted to receive.

6. In at least one other circuit, neither a defendant's belief as to the provisions of a plea agreement nor an attorney's misrepresentations to his client regarding the agreement control its scope or enforceability. See, *e.g., United States v. Caporale*, 806 F.2d 1487, 1517 (11th Cir.1986), certiorari denied, 483 U.S. 1021, 107 S.Ct. 3265, 97 L.Ed.2d 763.

7. Pursuant to this provision, the attorney for the government may "make a recommendation, or agree not to oppose the defendant's request, for a particular sentence, with the understanding that such recommendation or request shall not be binding upon the court." Fed.R.Crim.P. 11(e)(1)(B).

enteen counts under Rule 11(e)(1)(C),[8] an outcome he and the government apparently were not yet prepared to adopt during the exchange quoted above.

What emerges from this conversation is that the government and Carnine were engaged in a discussion of a number of possible agreements which contemplated different guarantees in exchange for Carnine's plea, but which depended upon the number of counts to which he agreed to plead guilty. At one point, Carnine alluded to the complicated discussions under way, describing how "the government keeps changing its mind. I can't get anything straight." App. at 12. After much deliberation the parties reached an agreement, but it still remains unclear whether everyone got it straight.

At several points in the proceedings, the court at great length quizzed Carnine on his understanding of the plea agreement and determined to its satisfaction that he knowingly and voluntarily entered his guilty plea. Additionally, Carnine admitted that the government did not attempt to compel his plea with threats, promises, or representations other than those provisions incorporated into the agreement in accordance with due process requirements. See, e.g., *Mabry v. Johnson*, 467 U.S. 504, 508–09, 104 S.Ct. 2543, 2546–47, 81 L.Ed.2d 437; *Brady v. United States*, 397 U.S. 742, 755, 90 S.Ct. 1463, 1472, 25 L.Ed.2d 747. The government includes in its brief copious quotations of these exchanges, endeavoring to prove that Carnine, by his own admission, understood the agreement's provisions—in particular the effective date of the Indiana sentence. But these excerpts suggest only that Carnine believed then that the plea agreement incorporated the objectives he thought he had bargained for, and not, as the government argues, that he consented to the agreement as it now operates.

The government also seizes on Carnine's statement in the passage above describing how the two sentences are supposed to be identical, guaranteeing that he serve "not another day." App. at 24. This locution supposedly indicates the unreasonableness of Carnine's belief: Even if the Indiana and Ohio sentences commenced on the same date, the government reasons, the difference in length between them (the former being sixty months, the latter forty-six months) makes it impossible for them to be identically concurrent. Although Carnine later said he understood that the sixty-month term would overlap with the existing sentence—that it would "extend beyond that as well," as the judge put it, App. at 56—such an admission does not undermine the reasonableness of his belief that the two terms nevertheless could begin on the same date. The government has its math right, but fails to consider the possibility of credits for good behavior and parole eligibility reducing the length of the Indiana sentence, a prospect Carnine was aware of and one which the judge reviewed with him at sentencing: "I think you ought to regard [this] as an appropriate disposition, and in some ways a fortunate disposition, that the time doesn't get stacked in any substantial way; especially since this case is not under the guidelines, and is subject to the old parole eligibility requirements and so forth."[9] *Id.* at 71.

The record conclusively supports neither the government's nor Carnine's interpreta-

---

**8.** In contrast to 11(e)(1)(B), under this provision the government attorney may "agree that a specific sentence is the appropriate disposition of the case." Fed.R.Crim.P. 11(e)(1)(C).

In its notes on the 1979 Amendment to subdivision (e)(2) of Rule 11, the advisory committee highlights the difference between 11(e)(1)(B) and (C), emphasizing that under the latter

there must ultimately be an acceptance or rejection [of the agreed-to sentence] by the court ... so that it may be determined whether the defendant shall receive the bargained-for concessions or shall instead be afforded an opportunity to withdraw his plea....

... [A] type (B) agreement is distinguishable from the others in that it involves only a recommendation or request not binding on the court....

Advisory committee's notes on 1979 Amendment to Fed.R.Crim.P. 11.

**9.** The government cites this language as well to illustrate that Carnine understood that the Indiana sentence could not possibly begin on October 18, 1988. But the judge's statement that "the time doesn't get stacked in any substantial way" has several potential meanings: (1) According to the government's interpretation, it could refer to the fact that the two sentences are concurrent, as opposed to consecutive. (2) Or,

932

tion of the plea agreement. The dialogue between Mattox, Powell, and the court suggests, however, that both lawyers were cognizant of Carnine's expectations regarding the commencement date of the Indiana sentence. Mattox indeed advocated Carnine's position at the hearing on October 23, 1989. At the very least, then, the record supports an inference that the parties discussed and considered stipulating October 18, 1988 as the commencement day of the sentence. It remains unclear whether the government actually promised Carnine that it would fulfill this condition, or whether it was only one of several options under consideration. But circumstantial evidence lends sufficient credibility to Carnine's belief that the agreement reduced to writing the guarantee that the sentence would commence on October 18, 1988.

██ According to Carnine's version of events, the government made this promise "both before the hearing held October 23, 1989 . . . and at the hearing." Appellant's Brief, filed July 23, 1991, at 9. Specifically, he claims that during a "sidebar" conference Powell, Mattox, and Hammerle agreed that the Indiana sentence would run from October 18, 1988, with Powell assuring Carnine that he would "do no more time." *Id.* at 11. The government responds that even if it reached such an agreement with Carnine at the time, the plea agreement does not provide for it. Appellee's Brief at 21. Carnine claims to have added to the agreement the words "on

in the alternative, perhaps she meant that Carnine received a favorable deal, considering the fact that he could have been sentenced to 110 years in prison had the case gone to trial and Carnine been found guilty on all twenty-two counts of the indictment. (3) Then again, maybe the time will not get stacked in a significant way because the sentence is subject to the old parole eligibility requirements. (4) Perhaps, as Carnine claims to have believed to his satisfaction at the close of sentencing, the time would not overlap in a substantial way because the Indiana sentence would run from the effective start date of the Ohio sentence. (5) Or maybe it means some combination of these constructions. While Judge Barker is not to blame, the possibilities are manifold.

10. The needless enigma of the second paragraph of the plea agreement troubles us, and we are particularly at a loss to understand Carnine's

October 18, 1988" ·at a recess, with the consent of the government, in order "to avoid confusion later over the issue." [10] Appellant's Reply Brief, filed Sept. 9, 1991, at 10. Powell, whom Carnine describes as "the main actor and negotiator", *id.* at 5, was absent from the sentencing hearing on December 8, 1989.

██ Without passing judgment on the veracity of this rendition of events, we emphasize that "when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." *Santobello v. New York,* 404 U.S. 257, 262, 92 S.Ct. 495, 499, 30 L.Ed.2d 427; *Bowler,* 585 F.2d at 854. Under a related principle recognizing the unique contractual nature of plea agreements, "when it develops that the defendant was not fairly apprised of its consequences [his plea can] be challenged under the Due Process Clause." *Mabry,* 467 U.S. at 509, 104 S.Ct. at 2547 (citation omitted).

It is imperative for plea agreements to be definite and unambiguous. While the vagaries of language may obscure the intentions of parties in even the most carefully considered agreement, *Fields,* 766 F.2d at 1169, a simple statement here as to the commencement date of the Indiana sentence would have averted this entire exercise. In the future, prosecutors should use greater care in drawing up plea agreements that defendants must sign.

assertion that he, a layman, wrote the terms of the agreement. This practice thwarts "the importance of counsel during plea negotiations." *Bordenkircher v. Hayes,* 434 U.S. 357, 362, 98 S.Ct. 663, 667, 54 L.Ed.2d 604; *Brady v. United States,* 397 U.S. 742, 758, 90 S.Ct. 1463, 1474, 25 L.Ed.2d 747.

Presumably, one of Carnine's two lawyers was present during the drafting. The signature of Mattox in fact appears just above Carnine's, yet the U.S. Attorney does not dispute Carnine's claim of authorship. Nonetheless, the government "may not rely on favorable judicial construction to cure significant ambiguities in its plea agreements." *United States v. Cook,* 668 F.2d 317, 321 (7th Cir.1982). See also *United States v. Ataya,* 864 F.2d 1324, 1333 (7th Cir. 1988) ("One of the constitutive aspects of a plea agreement—indeed, of law itself—is that its requirements be made known to those subject to it in an intelligible fashion.") (citation omitted).

## C. Abuse of Discretion

Protesting the district court's denial of his motion "with prejudice as to any claim", App. at 3, Carnine expresses concern that the court has permanently foreclosed the possibility of future relief. In actuality, the words "any claim" serve to distinguish the district court's alternate constructions of the motion as an attack either on the validity or on the execution of the sentence. We therefore find that because the district court did not issue a "blanket order", as Carnine terms it, it neither committed plain error nor abused its discretion on this point.

## III. CONCLUSION

An evidentiary hearing is necessary when the party requesting it raises "a significant, disputed factual issue." *Osborne*, 931 F.2d at 1162. Here that is the case. For the reasons set forth above, we REVERSE the judgment of the district court and REMAND for an evidentiary hearing to determine the start date of the Indiana sentence.